**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 8, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WILDERNESS WORKSHOP; HIGH
COUNTRY CITIZENS' ALLIANCE;
WESTERN COLORADO
CONGRESS; WESTERN SLOPE
ENVIRONMENTAL RESOURCE
COUNCIL; CENTER FOR
BIOLOGICAL DIVERSITY; BOARD
OF COUNTY COMMISSIONERS
FOR PITKIN COUNTY,

     Plaintiffs-Appellants,

v.

UNITED STATES BUREAU OF
LAND MANAGEMENT; UNITED
STATES FOREST SERVICE,

     Defendants-Appellees.

SG INTERESTS I, LTD.,

     Defendant-Intervenor-Appellee.

---------------------

COLORADO OIL AND GAS
ASSOCIATION; CONGRESS OF
RACIAL EQUALITY; HAROLD
SHEPHERD,

     Amici Curiae.

No. 08-1165

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:08-cv-00462-REB-MEH)**

Robin Cooley, Earthjustice Legal Defense Fund, Denver, Colorado, (Andrew Evans Hartsig, Earthjustice Legal Defense Fund, Denver, Colorado; Christopher G. Seldin, Pitkin County Attorney's Office, Aspen, Colorado, with her on the brief), for Plaintiffs-Appellants.

Aaron P. Avila, Environment & Natural Resources Division, (Ronald J. Tenpas, Assistant Attorney General, with him on the brief), United States Department of Justice, Washington, D.C., for Defendants-Appellees.

L. Poe Leggette, Fulbright & Jaworski L.L.P., (Nancy L. Pell and David Y. Chung, Fulbright & Jaworski L.L.P., Washington, D.C., with him on the brief), Denver, Colorado, for S.G. Interests I, Ltd., Defendant-Intervenor-Appellee.

William G. Myers III, Holland & Hart LLP, Boise, Idaho, filed an amicus curiae brief for the Colorado Oil and Gas Association.

Donald I. Schultz, Schultz & Belcher LLP, Cheyenne, Wyoming, filed an amicus curiae brief for the Congress of Racial Equality.

Harold Shepherd, Pro Se, Moab, Utah, filed an amicus curiae brief on his own behalf.

Before **BRISCOE, McCONNELL,** and **TYMKOVICH**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Plaintiffs Wilderness Workshop, High Country Citizens' Alliance, Western Colorado Congress, Western Slope Environmental Resource Council, Center for Biological Diversity, and Board of County Commissioners for Pitkin County

(Colorado) filed suit challenging a decision by defendants, the United States Bureau of Land Management (BLM) and the United States Forest Service (Forest Service), authorizing defendant/intervenor SG Interests I, Ltd. (SG) to construct, operate, and maintain a natural gas pipeline through roadless national forest land. In connection with their suit, plaintiffs sought and were denied a preliminary injunction by the district court. Plaintiffs have now filed an interlocutory appeal from the district court's order denying their motion for preliminary injunction. Exercising jurisdiction pursuant to 28 U.S.C. § 1292(a), we affirm.

## I.

In June 2004, SG and its authorized agent, Trigon EPC, sought authorization from the BLM "to construct, operate, and maintain a natural gas pipeline and related facilities on public lands administered by the BLM," and "National Forest System . . . lands." App. at 749. The proposed pipeline, referred to as the Bull Mountain Pipeline, "would accommodate anticipated natural gas production from the Bull Mountain Unit in addition to future 'common carrier' . . . capacity needs that could arise from other existing leased production areas." Id. More specifically, the proposed project would "involve the installation [of] approximately 25.5 miles (approximately 5.5 miles on private land) of 20-inch diameter buried steel natural gas pipeline and related aboveground appurtenances for the purpose of transporting natural gas from the Bull Mountain Unit to the existing Divide Creek Compressor Station for delivery

3

into interstate natural gas pipeline systems and the national energy market." Id. at 750. The proposed project "would also involve the connected action of construction and operation of a four-acre compressor station, natural gas processing facility and associated facilities on private land at the southern end of the pipeline." Id. at 751.

In response to SG's application, the BLM and the Forest Service, via its White River National Forest and Grand Mesa-Uncompahgre and Gunnison National Forests management officials, engaged in a lengthy period of environmental analysis "to analyze and disclose the potential environmental consequences of granting the proposed authorization[] . . . and a range of reasonable alternatives including a No Action alternative." Id. at 750. The agencies' environmental analysis culminated in the issuance of a final environmental impact statement (FEIS) on November 16, 2007.

Less than two months thereafter, on January 8, 2008, the BLM and the Forest Service issued a Record of Decision (ROD) authorizing the issuance of "a 30-year, 50-foot" right-of-way for the Bull Mountain Pipeline, as well as temporary use permits, to SG. Id. at 750. The 50-foot right-of-way "would be immediately adjacent to and paralleling existing natural gas pipeline [right-of-ways] (Ragged Mountain Pipeline and Rocky Mountain Natural Gas Pipeline) for

4

approximately 10 miles of the total . . . 25.5 mile route."[1]  Id. at 87.  "Of the 10 miles paralleling the existing pipeline [right-of-ways], 7.7 miles would be on [National Forest System] lands and 2.3 miles on private lands."  Id.  "The proposed [right-of-way] would pass through a total of 8.33 miles of Inventoried Roadless Areas (IRAs) on [National Forest Service] lands."  Id. at 152.  "Approximately 5.66 miles of the 8.33 miles . . . within . . . IRAs would follow . . . the Ragged Mountain Pipeline."[2]  Id.  The temporary use permits issued for the Bull Mountain Pipeline included a "construction [right-of-way] of approximately 100 feet (50 feet additional to permanent [right-of-way])."  Id. at 81.  As part of the ROD, the Forest Service also "authorize[d] road use permits for construction, reconstruction, use, upgrade, and/or maintenance of [Forest Service] and/or temporary roads needed for access to the pipeline construction [right-of-way]."[3]  Id. at 750.  "Surface disturbance during . . . pipeline construction is estimated to be 390 acres . . . ."  Id. at 81.

According to the record on appeal, the Bull Mountain Pipeline will be

---

[1] "SG would install the . . . proposed pipeline[] generally at the edge of any existing pipeline [right-of-ways] using a standard 25-foot offset from the center of the existing pipelines which would result in a 10-foot [right-of-way] overlap where the proposed pipeline follows existing pipelines."  App. at 152-53.

[2] Thus, it appears that 2.67 miles of the proposed Bull Mountain Pipeline would fall within IRAs in which there is no preexisting pipeline right-of-way. App. at 152.

[3] We note that none of these permits authorized such activity within an IRA.

5

constructed over a three-year period, with construction activities occurring only between May 1 and October 1 of each year. After construction is completed, the 100-foot construction right-of-way will be rehabilitated and revegetated. However, trees will not be allowed to regrow in the pipeline's permanent 50-foot right-of-way. As for activity on the right-of-way, "[s]urface patrols w[ill] be conducted by pedestrian surveys or horseback as no motorized vehicles w[ill] be allowed on the pipeline [right-of-way] for normal surface patrols." Id. at 150. "Motorized vehicles w[ill] only be authorized on a case-by-case basis in order to access the right-of-way for emergency repair needs with notification provided to [the Forest Service] and/or BLM prior to access." Id.

On March 5, 2008, plaintiffs filed this action alleging that the ROD violates: (1) the Forest Service's 2001 Roadless Area Conservation Rule (Roadless Rule), 66 Fed. Reg. 3272-73 (Jan. 12, 2001); and (2) the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4370f. In connection with their complaint, plaintiffs sought a preliminary injunction preventing SG from beginning construction of the pipeline. On April 30, 2008, the district court denied plaintiffs' motion for preliminary injunction. Plaintiffs have now filed an interlocutory appeal seeking review of the district court's denial of their motion for preliminary injunction.

II.

*Standard of review*

We review the district court's denial of plaintiffs' motion for preliminary injunction for abuse of discretion. See Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1065 (10th Cir. 2001). "An abuse of discretion occurs only when the trial court bases its decision on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." Id. (internal quotation marks omitted).

"To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." Gen. Motors Corp. v. Urban Gorilla, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007). "[B]ecause a preliminary injunction is an extraordinary remedy, the [movant's] right to relief must be clear and unequivocal." Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks omitted).

*Substantial likelihood of success*

In analyzing the "substantial likelihood of success" factor, we must, because neither the Roadless Rule nor NEPA provide for a private right of action, review the defendants' approval of the Bull Mountain Pipeline as a final agency

7

action under the Administrative Procedures Act (APA).  Utah Envtl. Cong. v. Troyer, 479 F.3d 1269, 1280 (10th Cir. 2007).  Under that standard, we will not overturn the defendants' decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Id.; 5 U.S.C. § 706(2)(A).  "An agency's decision will be deemed arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Troyer, 479 F.3d at 1280 (internal quotation marks omitted).  "Likewise, an agency's decision will be deemed arbitrary and capricious if the agency failed to base its decision on consideration of the relevant factors, or if there has been a clear error of judgment on the agency's part."  Id. (internal quotation marks omitted).

*1) The alleged Roadless Rule violation*

Plaintiffs claim that the defendants' authorization of the Bull Mountain Pipeline project violated the Forest Service's Roadless Rule.  In Wyoming v. U.S. Department of Agriculture, 414 F.3d 1207 (10th Cir. 2005), we summarized the background of the Roadless Rule:

> In October 1999, at the direction of President Clinton, the Forest Service initiated a public rulemaking process designed to protect the remaining roadless areas within the National Forest System.  See Notice of Intent to Prepare an Environmental Impact Statement, 64 Fed. Reg. 56,306 (Oct. 19, 1999).  The proposed rule and Draft

8

Environmental Impact Statement ("DEIS") were published in early May 2000.  See Notice of Proposed Rulemaking, 65 Fed. Reg. 30,276 (May 10, 2000).  Public comments were received until July 17, 2000, and thereafter the Final Environmental Impact Statement ("FEIS") was published in November 2000.  In January 2001 the Forest Service announced the adoption of the Roadless Rule, which prohibited road construction, reconstruction, and timber harvest in inventoried roadless areas located on National Forest System lands unless an exception applied.  36 C.F.R. § 294.12(a)-(b) (2001). [footnote omitted] The Rule affected approximately 58.5 million acres (or thirty-one percent) of the National Forest System lands . . . .

Id. at 1210-11.[4]

The Roadless Rule includes the following prohibition on road construction

in IRAs within a national forest:

(a) A road may not be constructed . . . in inventoried roadless areas of the National Forest System, except as provided in paragraph (b) of

---

[4]  The Roadless Rule was "[a]lmost immediately . . . embroiled in litigation."  Wyoming, 414 F.3d at 1211 (citing Kootenai Tribe v. Veneman, 313 F.3d 1094, 1126 (9th Cir. 2002) (reversing preliminary injunction that prohibited implementation of the Roadless Rule)).  As a result of this litigation, the Roadless Rule did not actually go into effect until April 2003.  California ex rel. Lockyer v. U.S. Dep't of Agric., 459 F. Supp. 2d 874, 881 (N.D. Cal. 2006).  Shortly thereafter, however, a federal district court in Wyoming issued a nationwide permanent injunction against the Roadless Rule.  Wyoming v. U.S. Dep't of Agric., 277 F. Supp. 2d 1197 (D. Wyo. 2003).  In 2005, after we heard oral argument in the appeal of the Wyoming district court's ruling, the Forest Service revoked the Roadless Rule and replaced it with the State Petitions for Inventoried Roadless Area Management Rule (State Petitions Rule), 70 Fed. Reg. 25,654 (May 13, 2005).  Lockyer, 459 F. Supp. 2d at 881.  However, in 2006, a federal district court in California concluded that the State Petitions Rule was invalid because it "was adopted without environmental analysis under NEPA or consultation under ESA about potentially affected endangered or threatened species."  Id.  As a remedy, that court "reinstate[d] the . . . Roadless Rule."  Id. at 916.

this section.

(b) Notwithstanding the prohibition in paragraph (a) of this section, a road may be constructed . . . in an inventoried roadless area if the Responsible Official determines that one of the following circumstances exist:

> (1) A road is needed to protect public health and safety in cases of an imminent threat of flood, fire, or other catastrophic event that, without intervention, would cause the loss of life or property;

> (2) A road is needed to conduct a response action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) or to conduct a natural resource restoration action under CERCLA, Section 311 of the Clean Water Act, or the Oil Pollution Act.

66 Fed. Reg. 3272 (originally at 36 C.F.R. § 294.12).

As a reading of this regulatory prohibition makes clear, its application hinges on the following definitions found in the Roadless Rule:

> Inventoried roadless areas. Areas identified in a set of inventoried roadless area maps, contained in Forest Service Roadless Area Conservation, Final Environmental Impact Statement, Volume 2, dated November 2000, which are held at the National headquarters office of the Forest Service, or any subsequent update or revision of those maps.

> * * *

> Road. A motor vehicle travelway over 50 inches wide, unless designated and managed as a trail. A road may be classified, unclassified, or temporary.

> (1) Classified road. A road wholly or partially within or adjacent to National Forest System lands that is determined to be needed for long-term motor vehicle access, including State roads, county roads, privately owned roads, National Forest System roads, and other roads

10

authorized by the Forest Service.

(2) Unclassified road.  A road on National Forest System lands that is not managed as part of the forest transportation system, such as unplanned roads, abandoned travelways, and off-road vehicle tracks that have not been designated and managed as a trail; and those roads that were once under permit or other authorization and were not decommissioned upon the termination of the authorization.

(3) Temporary road.  A road authorized by contract, permit, lease, other written authorization, or emergency operation, not intended to be part of the forest transportation system and not necessary for long-term resource management.

Road construction.  Activity that results in the addition of forest classified or temporary road miles.

66 Fed. Reg. 3272 (originally at 36 C.F.R. § 294.11).

Defendants, in issuing the ROD in this case, concluded there would be no violation of the Roadless Rule because the proposed pipeline could "be built within IRA's without road construction."  App. at 754.  In support of this conclusion, the ROD stated as follows:

The area of surface disturbance that will occur to clear the right-of-way, dig a trench, bring pipe to the site, lower the pipeline into the trench, backfill and bury the pipeline, recontour the surface, and revegetate disturbed soil:

• Will not be used as a motor vehicle travelway . . . .  The sole reason for creating surface disturbance, which within the IRA's will be limited to the confines of the construction right-of-way, will be for the purpose of accommodating motorized equipment needed to construct and bring in the supplies needed to install the pipeline.

• Will not result in the addition of forest classified or temporary road miles.

11

• Is a "construction zone", not a "road", as disclosed in Section 3.10 of the FEIS. Motorized equipment needed to clear the right-of-way, install the pipeline, bury it, and reclaim and revegetate disturbed areas within IRA's will access the construction right-of-way within the IRA's via existing roads located outside of the IRA's. When construction/reclamation equipment is located within the boundaries of an IRA, it will be confined to existing roads and to the construction zone within the designated right-of-way.

Id. at 755.

Plaintiffs claim in their suit that the defendants' conclusion was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The district court, in denying plaintiffs' motion for preliminary injunction, concluded that plaintiffs failed to establish that they had a substantial likelihood of succeeding on the merits of this claim. More specifically, the district court concluded:

Certainly there is room for debate about whether or not certain aspects of the pipeline right of way might fall within the roadless rule's definition of the term "road" during construction of the pipeline. Here, the BLM and the Forest Service considered the roadless rule and concluded that construction of the pipeline will not result in the addition of road miles in the roadless areas. As a reviewing court, I must give the agencies' interpretation of the roadless rule due deference, and I may reject that interpretation only if it is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." Bar MK Ranches v. Yeutter, 994 F.2d 735, 738 (10th Cir. 1993) (citation omitted).

App. at 1033. For the reasons that follow, we conclude the district court did not abuse its discretion in reaching this determination.

As we have noted, the Roadless Rule defines the term "road" as "[a] motor

12

vehicle travelway over 50 inches wide, unless designated and managed as a trail."
66 Fed. Reg. 3272. The key term in this definition, "travelway," is not defined in the Roadless Rule, nor does it appear to have any commonly accepted meaning, since it is not found in any contemporary dictionaries that we are aware of. Even assuming, as asserted by plaintiffs, that the term is synonymous with "route" or "path," we conclude it is ambiguous because it is reasonably "'capable of being understood in two or more possible senses or ways.'" Chickasaw Nation v. United States, 534 U.S. 84, 90 (2001) (quoting Webster's Ninth New Collegiate Dictionary 77 (1985)). For example, the term could be, as suggested by plaintiffs, interpreted broadly as referring to any area over which a motor vehicle can move from one point to another, regardless of the overall purpose of the area or the purpose of the vehicular activity. Alternatively, the term could be interpreted more narrowly as referring to an area whose exclusive purpose is for motor vehicle through-traffic, rather than the localized use of motorized equipment ancillary to an altogether different, and non-prohibited, purpose.

Although the ROD does not include a detailed analysis or discussion of the definitional language of the Roadless Rule, it is apparent from the analysis contained therein that defendants chose to adopt a more narrow definition of the term "travelway." In particular, defendants effectively interpreted the term "travelway" as excluding "construction zones," such as the 100-foot right-of-way necessary in this case for installation of the Bull Mountain Pipeline. Defendants'

13

interpretation is entitled to deference.  See Auer v. Robbins, 519 U.S. 452, 463

(1997) (noting that an agency has "power to resolve ambiguities in [its] own

regulations"); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)

(noting that a reviewing court "must give substantial deference to an agency's

interpretation of its own regulations").

Nothing in the record before us or in the parties' pleadings persuades us

that plaintiffs can successfully overcome this deference.  To begin with,

defendants and SG have aptly noted that defendants' interpretation is consistent

with two provisions of the Roadless Rule's preamble.  The first such provision

expressly distinguishes between wilderness areas and IRAs and states that IRAs

can reasonably be used for "a multitude of activities including motorized uses,

grazing, and oil and gas development."  66 Fed. Reg. 3249.  This statement

clearly favors defendants' decision to interpret the term "travelway" as excluding

construction zones necessary for oil and gas development.[5]  The second provision

of the preamble indicates that the Roadless Rule was adopted, in part, because of

"budget constraints" that were making it impossible for the Forest Service to

manage "the existing forest road system . . . to the safety and environmental

---

[5] We emphasize that the defendants' interpretation does not provide the
Forest Service with limitless discretion to grant easements for motor vehicle
travel that would undermine the purpose of the Roadless Rule.  The grant must be
made primarily for a permitted purpose other than the movement of motor
vehicles, such that any use of the easement for such movement is merely
collateral.

14

standards to which it was built." Id. at 3244. This statement likewise favors

defendants' interpretation because nothing in the record suggests that

"construction zones," at least those necessary for oil and gas development, would

ever be considered part of the forest road system. Thus, the authorization of such

construction zones will not burden the Forest Service's road maintenance budget.

Lastly, defendants have noted, without serious dispute from plaintiffs, that they

have applied the same interpretation of the term "travelway" in a prior case, i.e.,

concluding that construction zones do not qualify as "roads" under the Roadless

Rule.[6] See Hammond v. Norton, 370 F. Supp. 2d 226, 262 (D.D.C. 2005) ("The

Forest Service appears to interpret the term 'motor vehicle travelway' in the

regulatory definition of a 'road' not to include the construction zones

contemplated here, despite the acknowledged presence of motorized vehicles in

the area.").

In sum, we conclude the district court did not abuse its discretion in

determining that plaintiffs failed to establish a substantial likelihood of success

on their Roadless Rule claim.

*2) The alleged NEPA violation*

Plaintiffs also allege they are entitled to preliminary injunctive relief on the

basis of their complaint's second claim for relief, which alleges that defendants,

---

[6] According to the record on appeal, the IRAs at issue were apparently considered, and ultimately rejected, for designation as wilderness areas.

15

in issuing their ROD, violated NEPA by failing to "consider the impacts of future natural gas development [i.e., the installation of additional gas wells] as a connected action."  Parties' Proposed Scheduling Order at 4.[7]

NEPA "requires federal agencies to examine and disclose the environmental impacts of their proposed actions" in the form of an environmental impact statement (EIS).  Utah Envtl. Cong. v. Richmond, 483 F.3d 1127, 1133 (10th Cir. 2007).  Relevant to this case, NEPA's implementing regulations require federal agencies, in conducting such examinations, to take into consideration "connected actions."  40 C.F.R. §1508.25(a)(1).  "Actions are [deemed to be] connected [for purposes of NEPA] if they":

> (i) Automatically trigger other actions which may require environmental impact statements.

> (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

Id. § 1508.25(a)(1)(i)-(iii).[8]

---

[7] In the proposed scheduling order that has been filed by the parties in district court, plaintiffs now also claim that defendants failed to "consider adequately the environmental effects of future gas development as an indirect or cumulative impact of the Bull Mountain pipeline."  Parties' Proposed Scheduling Order at 4.  Notably, however, plaintiffs did not assert these arguments in their motion for preliminary injunction.  Thus, it is unnecessary for us to consider them in the context of this appeal.

[8] NEPA's implementing regulations also require federal agencies to

(continued...)

16

"The purpose of this requirement is to prevent an agency from dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." Great Basin Mine Watch v. Hankins, 456 F.3d 955, 969 (9th Cir. 2006) (internal quotation marks omitted). Reviewing courts "apply an 'independent utility' test to determine whether multiple actions are so connected as to mandate consideration in a single EIS." Id.; see Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1183 (10th Cir. 2002) (noting that this circuit applies the "independent utility" test). "The crux of the test is whether each of two projects would have taken place with or without the other and thus had independent utility." Great Basin, 456 F.3d at 969 (internal quotation marks omitted); see Utahns for Better Transp., 305 F.3d at 1183 ("An inquiry into independent utility reveals whether the project is indeed a separate project, justifying the consideration of the environmental effects of that project alone.").

"It is important to note that 'projects', for the purposes of NEPA, are described as 'proposed actions', or proposals in which action is imminent."

[8](...continued) consider the "cumulative impact" of proposed actions. "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. In addition, federal agencies must consider the direct and indirect effects that will be caused by a proposed action. 40 C.F.R. § 1508.8. As previously noted, these considerations are not before us in this appeal.

O'Reilly v. U.S. Army Corps of Eng'rs, 477 F.3d 225, 236 (5th Cir. 2007) (citing

40 C.F.R. § 1508.23). "[T]he mere contemplation of certain action is not

sufficient to require an impact statement." Id. (internal quotation marks omitted).

"While a cumulative impact analysis requires the [reviewing agency] to include

'reasonably foreseeable' future actions in its review, improper segmentation is

usually concerned with projects that have reached the proposal stage." Id.

In this case, the defendants concluded in their FEIS, in response to public

comments, that it was unnecessary to analyze potential natural gas well

development as a "connected action":

> [SG] notes that their development of the Bull MT lease unit may
> result in 55-60 [natural gas] wells over 10 years. Those estimates are
> speculative and are dependent on market conditions and other
> factors. This information is best addressed as potential foreseeable
> actions in the [cumulative effects] analysis. The direct action is the
> installation of the pipeline. The connected action that would have to
> happen for use of a new pipeline is the installation of the Compressor
> site on private ground. The # of wells that would result on the Bull
> MT lease unit or on other leases in the larger area is entirely
> speculative in nature.

App. at 620.

> To the extent possible, [we] have included for the purposes of
> cumulative effects analysis the number of wells that could reasonably
> be serviced by the Bull Mountain pipeline. Although the presence of
> the Bull Mountain pipeline would create a situation in which the area
> is more attractive for natural gas production operations, there are no
> assurances that other leases in the area would be developed by
> drilling. Projecting number of wells based on amount of leased
> acreage is not meaningful because development of specific lease
> holds depends on gas price and demand, among many other variables.
> Thus, there are too many variables to predict future activities with

18

any certainty. . . . To the extent feasible to facilitate cumulative effects analysis, [we] have projected the number of wells that may be serviced by the [Bull Mountain Natural Gas Pipeline] . . . .

The scope of cumulative error analysis was carefully considered and it is unreasonable to expect the EIS to include the analysis of impact associated with speculative oil and gas development. Further, we believe that an increasing nationwide demand for natural gas is the primary driving force behind the growing level of exploration and development in the Rocky Mountain region during the last several years. Additional infrastructure to transport the gas into the interstate pipeline grid is a result, not a cause, of development.

Id. at 663.

The district court, in denying plaintiffs' motion for preliminary injunction, acknowledged that defendants "did not consider development of new gas wells that would be facilitated by the pipeline as connected actions." App. at 1034. Rather, the district court noted, "[t]he only actions explicitly considered [by defendants] as connected actions . . . [we]re compressor stations at the northern and southern ends of the pipeline."[9] Id. The district court ultimately concluded, however, that plaintiffs failed to demonstrate "a substantial likelihood that they w[ould] succeed on their challenge to the FEIS under the NEPA." Id. at 1036. In support of this conclusion, the district court stated as follows:

As with the roadless rule, there is room for debate about application

---

[9] The district court did note, however, that defendants' "air quality analysis . . include[d] an analysis of potential development of gas wells that would be served by the pipeline." App. at 1034. In particular, the district court noted, defendants took into account in their air quality analysis the fact that SG's plan of development envisioned the drilling of 55 to 60 new gas wells over a ten to twelve year period. Id.

of the relevant connected action criteria to anticipated gas well development. However, I conclude that the current record generally indicates that the agencies considered the relevant factors and made a rational determination based on those factors. The pipeline will transport gas from existing wells and could transport gas from future wells. The pipeline can exist without future well development, although that circumstance may be economically unwise. Future wells can exist without the pipeline. The FEIS considered other possible pipeline routes, and the agencies noted in the FEIS that gas from new wells "would find other alternative means of transport from the area" if the pipeline does not exist. The pipeline will not automatically trigger additional wells, drilling of additional wells can proceed without the pipeline, and the pipeline and possible additional wells are not interdependent; that is, dependent on each other. Under the applicable definition of connected action, the fact that the existence of pipeline may encourage additional gas wells, and probably will serve any additional wells, does not mean necessarily that additional wells are connected actions.

Id. at 1036-37.

The district court did not abuse its discretion in reaching this conclusion. To begin with, the record on appeal establishes that SG has an immediate purpose for building the Bull Mountain Pipeline that has nothing to do with future gas well development. According to SG, it has, to date, "drilled or acquired a total of thirteen (13) natural gas wells in the Project area," nine of which "are located in the Bull Mountain Unit."[10] Supp. App. at 3. Based on its "most recent well

---

[10] There is some discrepancy in the record on appeal concerning the number of natural gas wells owned by SG in the Bull Mountain Unit. In particular, the FEIS refers to SG owning three natural gas wells in the Bull Mountain Unit, App. at 86, whereas a March 2008 declaration from an officer of SG's general partner, Robert H. Guinn, II, states that SG owns nine natural gas wells in the Bull Mountain Unit. Supp. App. at 3. Notably, however, both of these documents agree that SG's existing natural gas wells can produce approximately "8 million
(continued...)

20

pressure data, its thirteen wells can produce up to 8 million standard cubic feet of natural gas each day." Id. However, SG alleges, it is "currently unable to transport the majority of that natural gas due to the lack of existing pipeline capacity in the Project area." Id. More specifically, SG alleges that "[t]he main natural gas pipeline in the area is the 6-inch diameter Ragged Mountain Pipeline," and that "[b]ecause there is only one compressor for that pipeline, it can currently transport only about 7 million standard cubic feet of natural gas each day." Id. Further, because SG "only has the right to about 3.5 million standard cubic feet of the Ragged Mountain Pipeline's capacity," "several million standard cubic feet of natural gas are stranded at [SG's] well sites every day." Id. Installing the Bull Mountain Pipeline and using it solely on existing gas wells to transport stranded gas, SG alleges, will result in a net income stream of 14 million dollars per year. In addition, the evidence in the record indicates that installation of the Bull Mountain Pipeline will allow SG to deliver its natural gas to the national energy markets, as opposed to only the local markets that are reached by the existing pipeline. App. at 131-32. Based upon this record evidence, it appears that the Bull Mountain Pipeline will have independent utility, and thus defendants reasonably concluded it was proper to consider its environmental impact without

_____

[10](...continued)
standard cubic feet per day." App. at 86; Supp. App. at 3 (same). Thus, the discrepancy in the record regarding the number of gas wells owned by SG does not alter our analysis of plaintiffs' substantial likelihood of success on their NEPA claim.

21

further consideration of potential future gas well development.

To be sure, the capacity of the Bull Mountain Pipeline design is much larger than is necessary to simply serve the existing natural gas wells, and apparently by SG's own admission has been designed "to accommodate 'future common carrier capacity needs.'" Id. at 66. In particular, the Bull Mountain Pipeline is expected to initially produce approximately 80 million cubic feet of gas per day based upon existing gas wells, but is sized to convey up to 375 million cubic feet of gas per day. Id. at 193-94. However, as defendants noted in the FEIS, the development of additional natural gas wells is entirely speculative at this point, and will ultimately depend on "gas price and demand, among many other variables." Id. at 663. In other words, although SG is undoubtedly contemplating the development of additional gas wells in the area, nothing in the record on appeal suggests that such development is imminent. See O'Reilly, 477 F.3d at 236.

*Other preliminary injunction factors*

The district court also analyzed the remaining three prongs of the preliminary injunction test. With respect to the irreparable harm prong, the district court concluded that plaintiffs "produced evidence that they will suffer some imminent and irreparable injuries if the pipeline construction begins." App. at 1040. As for the balance of harms prong, the district court concluded that the threatened injury to plaintiffs was equally balanced "against the weight of the

22

public interest in gas production, and [SG's] demonstrated economic interests," and thus "this factor d[id] not weigh heavily in favor of either the plaintiffs or the defendants." Id. at 1042. Lastly, the district court concluded "that the public interest factor d[id] not weigh heavily in favor of either the plaintiffs or the defendants and [SG]." Id. at 1042-43. We are not persuaded, after reviewing the record on appeal, that the district court abused its discretion in reaching any of these conclusions.

The order of the district court denying plaintiffs' motion for preliminary injunction is AFFIRMED. The motions of the Colorado Oil and Gas Association, the Congress of Racial Equality, and Harold Shepherd to file amicus curiae briefs are GRANTED.