**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 27, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DINÉ CITIZENS AGAINST
RUINING OUR ENVIRONMENT;
SAN JUAN CITIZENS ALLIANCE;
WILDEARTH GUARDIANS;
NATURAL RESOURCES DEFENSE
COUNCIL,

        Plaintiffs - Appellees,

v.

SALLY JEWELL, in her official
capacity as Secretary of the United
States Department of the Interior;
UNITED STATES BUREAU OF
LAND MANAGEMENT, an agency
within the United States Department
of the Interior; NEIL KORNZE, in his
official capacity as Director of the
United States Bureau of Land
Management,

        Defendants - Appellees,

    and

WPX ENERGY PRODUCTION, LLC;
ENCANA OIL & GAS (USA), INC.;
BP AMERICA PRODUCTION
COMPANY; CONOCOPHILLIPS
COMPANY; BURLINGTON
RESOURCES OIL & GAS
COMPANY LP; AMERICAN
PETROLEUM INSTITUTE;
ANSCHUTZ EXPLORATION
CORPORATION,

No. 15-2130

Defendants Intervenors -
Appellees.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:15–CV–00209–JB–SCY)**

Kyle J. Tisdel, Western Environmental Law Center, Taos, New Mexico
(Samantha Ruscavage-Barz, WildEarth Guardians, Santa Fe, New Mexico, with
him on the briefs), for Plaintiffs-Appellants.

Emily A. Polachek, Attorney, Environmental and Natural Resources Division,
U.S. Department of Justice (John C. Cruden, Assistant Attorney General,
Environmental and Natural Resources Division; Clare M. Boronow, Attorney,
Environmental and Natural Resources Division, U.S. Department of Justice; and
Michael Williams, Office of the Solicitor, U.S. Department of the Interior, of
counsel, with him on the briefs), Washington, D.C., for Defendants-Appellees.

Hadassah M. Reimer of Holland & Hart LLP, Jackson, Wyoming (Stephen G.
Masciocchi and John F. Shepherd of Holland & Hart LLP, Denver, Colorado, and
Bradford Berge of Holland & Hart LLP, Santa Fe, New Mexico, with her on the
briefs) for Defendants Intervenors-Appellees.

Jon J. Indall and Joseph E. Manges of Comeau Maldegen Templeman & Indall
LLP, Santa Fe, New Mexico; Steven J. Rosenbaum of Covington & Burling LLP,
Washington, D.C., and Andrew D. Schau of Covington & Burling LLP, New
York, New York, for Defendant Intervenor-Appellee American Petroleum
Institute.

Before **KELLY**, **McKAY**, and **LUCERO**, Circuit Judges.

**McKAY**, Circuit Judge.

Plaintiffs appeal the district court's denial of their request for a preliminary

-2-

injunction to prevent the drilling of certain oil and gas wells in the Mancos Shale formation of the San Juan Basin in New Mexico. The district court concluded that Plaintiffs had failed to satisfy three of the four elements required to obtain a preliminary injunction: (1) Plaintiffs had not demonstrated a substantial likelihood of success on the merits of their claims; (2) the balance of harms weighed against Plaintiffs; and (3) Plaintiffs failed to show that the public interest favored an injunction. Plaintiffs challenge each of these conclusions on appeal.

**I.**

The San Juan Basin is a large geographic region in the southwestern United States, including part of New Mexico. Drilling for oil and gas has occurred in the Basin for more than sixty years, and the Basin is currently one of the most prolific sources of natural gas in the country. The Basin includes both public and private lands. Many of the public lands and resources fall under the jurisdiction of the Bureau of Land Management's Farmington Field Office in New Mexico, which manages these lands and resources under its published Resource Management Plan.

In 2000, the BLM initiated the process of revising its existing RMP, which had been published in 1988. As part of this process, the BLM contracted with the New Mexico Institute of Mining and Geology to develop a "reasonably foreseeable development scenario," or RFDS, to predict the foreseeable oil and gas development likely to occur over the next twenty years. Based on historic

-3-

production data and available geologic and engineering evidence, the RFDS estimated that 9,970 new oil and gas wells would be drilled on federally managed lands in the New Mexico portion of the San Juan Basin during this time period. Of these wells, the RFDS estimated that more than forty percent would be "Dakota, Mancos" gas wells—wells that could produce gas from both the Mancos geologic horizon and the Dakota geologic horizon that lies below it. (Appellees' Supplemental App. at 37.) The RFDS estimated that only 180 new oil wells would be drilled in the Mancos Shale, due to the fact that most reservoirs in the Mancos Shale were approaching depletion under then-current technologies, but it noted that "there is excellent potential for the Mancos to be further evaluated." (Joint App. at 182.)

In 2003, the BLM issued its Proposed Resource Management Plan and Final Environmental Impact Statement (PRMP/FEIS). In this document, the BLM referred to the predictions and analysis contained in the RFDS in order to assess four proposed alternatives for managing federal lands in the San Juan Basin, including the "balanced approach" the agency ultimately decided to adopt. (*Id.* at 499.) Under this balanced approach, the BLM analyzed the cumulative impacts of an estimated 9,942 new wells in the San Juan Basin—approximately the same number predicted in the 2001 RFDS—by looking at, for instance, the likely air quality impacts from the drilling and operation of this many new wells in the region. The PRMP/FEIS did not discuss specific sites or approve any individual

wells, although it assumed the majority of new wells would be drilled in the high development area in the northen part of the managed area. The BLM issued its final RMP, adopting the Alternative D balanced approach, in December 2003.

Although this RMP generally allows for drilling in the San Juan Basin, a new well may not be drilled unless the operator first receives specific approval of its drilling plan through the submission of an application for a permit to drill, or APD, to the BLM. When the agency receives an APD, it reviews the planned drilling activity and prepares an environmental assessment of the environmental impacts of the proposed drilling, after which the agency may approve the APD as submitted, approve it with appropriate modifications or conditions, or deny it. In preparing this environmental assessment, the agency may incorporate by reference the general but more comprehensive environmental analysis included within its published RMP and focus the APD's environmental assessment "on the issues specific to the [proposed drilling]." 40 C.F.R. § 1502.20. This process is generally referred to as tiering. *See id.*

Beginning in about 2014, the BLM began receiving more APDs than anticipated for oil wells in the Mancos Shale. At the time the RMP was issued, oil and gas in the San Juan Basin were generally produced through hydraulic fracturing of vertical oil wells. However, subsequent technological advances have made it economical for oil and gas operators in the San Juan Basin to drill horizontal wells and conduct multi-stage fracturing, which enables them to tap

into oil and gas reserves that are not readily accessible through traditional vertical drilling techniques and produce four times as much oil and gas per well as they could have produced from a single vertical well. Between 2010 and 2015, the BLM approved approximately 265 APDs for drilling in the Mancos Shale. In its environmental assessment of each APD or set of related APDs, the agency reviewed the site-specific and cumulative impacts likely to arise from the proposed drilling. In its assessment of some of these impacts, and particularly in its discussion of the cumulative impacts, the BLM referred to its broader but more comprehensive environmental analysis in the 2003 RMP.

In 2014, the BLM prepared a new RFDS to better predict the Mancos Shale's potential for oil and gas development. The agency is now working on an RMP amendment to account for the estimated additional 1,930 oil wells and 2,000 gas wells in the Mancos Shale.

In March 2015, Plaintiffs filed this lawsuit under the National Environmental Policy Act, challenging 260 APDs in the Mancos Shale. Plaintiffs then moved for a preliminary injunction to prevent drilling on approved wells while this litigation is ongoing.[1] The district court denied this motion in a 101-page decision, holding that Plaintiffs were not likely to succeed on the merits of

_____

[1] Plaintiffs do not request preliminary relief for wells that have already been drilled. They assert that their request for a preliminary injunction involves a total of 142 APDs that have been approved but not yet drilled.

their claims and that Plaintiffs' potential harm was outweighed by the economic harms which the operators and the public would suffer if drilling was enjoined. This appeal followed.

**II.**

We review the district court denial of a preliminary injunction for an abuse of discretion. *Wilderness Workshop v. BLM*, 531 F.3d 1220, 1223 (10th Cir. 2008). "An abuse of discretion occurs only when the trial court bases its decision on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Id.* at 1224 (internal quotation marks omitted). "Our review of the district court's exercise of discretion is narrow, and the merits may be considered on appeal only insofar as they bear on the issue of judicial discretion." *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (internal quotation marks, ellipses, and citation omitted).

"In order to receive a preliminary injunction, the plaintiff must establish the following factors: (1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002) (internal quotation marks and brackets omitted). "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Wilderness*

*Workshop*, 531 F.3d at 1224 (internal quotation marks and brackets omitted).

The district court concluded that Plaintiffs had shown irreparable harm but had not satisfied the other three prerequisites for obtaining a preliminary injunction: Plaintiffs had not shown that they were likely to succeed on the merits; Plaintiffs had not demonstrated that the threatened environmental harms outweighed the certain economic harms the operators would face if they were prevented from drilling; and the public interest weighed against the injunction. Because each of these elements is a prerequisite for obtaining a preliminary injunction, we will not reverse the district court's denial of injunctive relief unless we are persuaded that the court abused its discretion as to all three issues, and if we see no abuse of discretion as to any one prerequisite, we must affirm the court's ruling.

Plaintiffs raise four main arguments as to why the district court erred in concluding that they had not demonstrated a substantial likelihood of success on the merits of their claim: (1) the district court applied too high a standard of "likelihood" in evaluating their claims; (2) the court should have concluded that the new horizontal drilling and multi-stage fracturing technologies will lead to environmental harm of a greater magnitude than was anticipated in 2003, so it is arbitrary and capricious for the BLM to continue tiering its analysis to the 2003 RMP; (3) the court should have concluded that these new technologies will lead to environmental harms that are qualitatively different from those anticipated in

2003, so it is arbitrary and capricious for the agency to continue tiering to the 2003 RMP; and (4) the court should have concluded that the BLM's continued approval of new wells will impermissibly limit the BLM's options as it amends the 2003 RMP, thus violating the regulations and satisfying the arbitrary and capricious standard of agency review. We consider each of these arguments in turn.

Plaintiffs first argue the district court committed legal error in describing and applying the applicable test for determining whether a movant has shown a substantial likelihood of success on the merits of his claim. In *Davis v. Mineta*, we stated that when the other three requirements "tip strongly in [the plaintiff's] favor, the test is modified, and the plaintiff may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." 302 F.3d at 1111 (internal quotation marks omitted). Plaintiffs argue that the district court erred in failing to apply this modified test.

However, as the district court correctly noted, our modified test is inconsistent with the Supreme Court's recent decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008). In *Winter*, the Court overruled the Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs who demonstrated a strong likelihood of prevailing on the merits

could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm. The Court held that the Ninth Circuit had impermissibly deviated from the Supreme Court's "frequently reiterated standard" for preliminary relief, which requires a showing of a likelihood of harm, and permitted a more lenient standard of relief "inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

Although the Ninth Circuit standard overruled in *Winter* dealt with a different prong of the preliminary injunction test than the prong at issue in this case, *Winter*'s rationale seems to apply with equal force here. "We do not . . . approach opinions of the Supreme Court with a view to reaching the narrowest construction possible. Instead, we have said that this court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *United States v. Nelson*, 383 F.3d 1227, 1232 (10th Cir. 2004) (internal quotation marks omitted); *see also United States v. Brooks*, 751 F.3d 1204, 1209 (10th Cir. 2014) (noting that our general rule against overturning a prior panel decision "does not apply . . . when the Supreme Court issues an intervening decision that is contrary to or invalidates our previous analysis" (internal quotation marks omitted)). Under *Winter*'s rationale, any modified test which relaxes one of the

prongs for preliminary relief and thus deviates from the standard test is impermissible. We accordingly hold that the district court did not abuse its discretion in simply applying the Supreme Court's "frequently reiterated standard" for preliminary relief, including the requirement that the plaintiff must show he is likely to succeed on the merits.

Plaintiffs also argue the district court went even beyond the normal standard for preliminary relief by requiring them to meet an "elevated burden" that was closer to a certainty of success than a reasonable likelihood. (Appellants' Opening Br. at 18.) This argument is based on the district court's preliminary discussion of how a "reasonable likelihood of success" standard may be understood in the context of a bench trial where the district court is reviewing an agency decision under the arbitrary and capricious standard of review. However, Plaintiffs ignore the fact that the district court then explicitly stated it would "apply the standard as written" (Joint App. at 133), and we see no indication the district court actually deviated from this standard in evaluating the merits of Plaintiffs' case.

Next, Plaintiffs argue they sufficiently demonstrated a likelihood of success on the merits because they presented evidence that the new horizontal drilling and multi-stage fracturing techniques being applied in the San Juan Basin will lead to harm of a greater magnitude than was anticipated when the BLM drafted the 2003 RMP. These new drilling techniques have greatly increased access to oil and gas

reserves that were not previously targeted for development and have given rise to much higher levels of development in the Mancos Shale than the BLM previously estimated and accounted for. Moreover, horizontal drilling and multi-stage fracturing may have greater environmental impacts than vertical drilling and older fracturing techniques. For instance, according to Plaintiffs, each horizontal well has approximately double the surface impact of each vertical well, and drilling a horizontal well leads to a 242%-333% increase in air pollutant emissions over the drilling of a vertical well. Plaintiffs argue that this increased level of development and environmental impacts means that the BLM acted arbitrarily and capriciously when it tiered its analysis of cumulative impacts in the APD approvals to the 2003 RMP.

We are not persuaded the district court abused its discretion in holding that Plaintiffs had failed to demonstrate a likelihood of success on the merits of this argument. As the district court pointed out, only 3,860 of the anticipated 9,942 new wells in the planning area were drilled in the twelve years between the issuance of the 2003 RMP and the court's consideration of this issue in 2015. Thus, even with increased drilling in the Mancos Shale formation and the switch to horizontal drilling and multi-stage fracturing, the overall amount of drilling and related surface impacts are still well within the anticipated level.[2] As for the

---

[2] The largest difference Plaintiffs identify between horizontal and vertical drilling relates to the amount of water used in drilling. According to Plaintiffs'

possibly increased air quality impacts, the agency considered these impacts in its environmental assessments and concluded that the approved drilling activities would not cause a significant increase in emissions over the amount anticipated in the RMP or a violation of national air quality standards for any criteria pollutant. After reviewing the agency's RMP and its assessment of site-specific and cumulative impacts in the APD approvals before us in this appeal, we are not persuaded that the district court abused its discretion in concluding that Plaintiffs have not shown a substantial likelihood of success on the merits of this argument.

We are similarly unpersuaded by Plaintiffs' argument that they are likely to succeed on the merits of their claims because new horizontal drilling and multi-

---

expert, hydraulically fracturing a horizontal well requires five to ten times more water than hydraulic fracturing of a vertical well. However, the BLM presented its own evidence that efforts are being made to recycle flowback water and that operators are using nitrogen foam to reduce the amount of water needed. Moreover, the BLM's field manager for the Farmington Office has asserted that the agency is not required to estimate the amount of water being used for drilling in the San Juan Basin because all water used in drilling and fracturing operations comes from permitted sources approved by the New Mexico State Engineer's Office. "Because the State of New Mexico has jurisdiction over water use, the State analyzes the impacts of potential groundwater depletion caused by these wells and has not determined that the current use will lead to depletion." (Joint App. at 680.) Plaintiffs do not address or even acknowledge these assertions. Although we express some concern over the BLM's apparent disavowal of any independent responsibility to consider whether hydraulic fracturing of horizontal wells may result in groundwater depletion in the San Juan Basin, it is Plaintiffs' burden in this interlocutory appeal to convince us that the district court abused its discretion in denying extraordinary relief, and we will not make Plaintiffs' arguments for them. Given the agency's position, Plaintiffs' bare assertion that horizontal wells require five to ten times as much water as vertical wells falls far short of meeting this burden.

-13-

stage fracturing technologies will lead to environmental impacts qualitatively different from the impacts assessed in the 2003 RMP. Plaintiffs argue there are two main reasons why these new technologies will cause different types of impacts from the impacts anticipated in the RMP. First, these technologies allow operators to extract significant amounts of oil from the Mancos Shale, while the RMP mainly anticipated the extraction of gas from other formations in a different region of the San Juan Basin. Second, horizontal drilling and multi-stage fracturing "involve a number of complexities not associated with conventional wells" that "could result in additional environmental impacts that were not anticipated or analyzed when the agency analyzed the impacts of conventional drilling methods in the 2003 [RMP]." (Appellants' Opening Br. at 21 (internal quotation marks omitted).)

Neither of these arguments is sufficiently developed or supported to sustain the conclusion that Plaintiffs are likely to succeed on the merits of their claim, given the deferential agency standard of review at issue in this case. Plaintiffs fail to present any argument or cite to any evidence as to how drilling in the Mancos Shale will cause different environmental impacts than drilling in other formations in the San Juan Basin—including the anticipated "Dakota, Mancos" drilling that the RFDS anticipated would account for more than forty percent of the new wells in the planning area over the next twenty years—or as to how additional oil wells will cause qualitatively different impacts from the smaller

-14-

number of oil wells and larger number of gas wells anticipated in the RMP. Plaintiffs have likewise failed to present us with any argument or evidence to support their contention that horizontal drilling and multi-stage fracturing may give rise to different types—rather than just different levels—of environmental harms when compared to the traditional vertical drilling and hydraulic fracturing techniques that have historically been used in the San Juan Basin. Since the plaintiff in an environmental case has the burden of proving that the agency action was invalid, *see Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008), Plaintiffs' failure to support their arguments on this issue is fatal to their argument that the district court abused its discretion in denying a preliminary injunction due to the different types of environmental harms allegedly caused by horizontal drilling and multi-stage fracturing.

Finally, Plaintiffs argue that the BLM's continued approval of new wells is impermissibly limiting the BLM's options as it amends the 2003 RMP, thus violating the regulations and satisfying the arbitrary and capricious standard of agency review. They also raise the related argument that the BLM's decision to amend the 2003 RMP to account for increased development in the Mancos Shale proves that the 2003 RMP is inadequate and thus the BLM acted arbitrarily and capriciously by referring to the 2003 RMP in its environmental assessments in the contested APDs.

When an agency has not yet prepared an environmental impact statement

for a proposed activity, it may not take an action relating to the proposed activity that would either have an adverse environmental impact or limit its choice of reasonable alternatives. *See* 40 C.F.R. § 1506.1. Plaintiffs argue the same reasoning must apply when an agency is amending its environmental impact statement to account for new developments affecting the planning area. However, Plaintiffs cite to no authority for their proposition that 40 C.F.R. § 1506.1 applies to interim development under an existing environmental impact statement and RMP. Moreover, we are not persuaded that the BLM's continued approval of wells under an existing RPM that allows for continued drilling in the planning area will impermissibly "limit the choice of reasonable alternatives" in the BLM's revision of its RMP.[3] We are also unpersuaded by Plaintiffs' argument that the BLM's decision to revise the RMP is evidence that the agency has acted arbitrarily and capriciously by referring to the 2003 RMP in its environmental assessments of the contested APDs. The agency's decision to improve its plan for managing federal lands in the San Juan Basin does not immediately invalidate the

---

[3] Notably, "[w]hen an RMP is revised after approval of a lease or an APD, those revisions may apply to existing leases and site-specific activities (such as operation of existing roads or wells)." (Joint App. at 666.) While it is conceivable that the BLM would decide to revise the RMP to reduce the number of wells it will approve in the Mancos Shale formation or call for the reclamation of additional drilled mines, Plaintiffs have failed to persuade us that the approval of a few more wells in an area that has been extensively mined for more than half a century will somehow limit the BLM's choice of alternatives for managing federal lands in the San Juan Basin.

old plan or prevent the agency from referring to it.

While Plaintiffs identify several areas in which they believe the BLM's methodologies and conclusions fall short, their disagreements with the agency's decision are insufficient to convince us that the district court abused its discretion in concluding they had not shown a substantial likelihood of success on their claim that the agency acted arbitrarily and capriciously in approving the APDs. We therefore affirm on this ground and do not address the parties' arguments regarding the other three prerequisites for preliminary relief. We note that this decision does not foreclose an ultimate ruling in Plaintiffs' favor. The record before us in this interlocutory appeal is not the final administrative record that will be used to resolve the merits of this case, and additional evidence, better-developed arguments, or further consideration may lead to the conclusion that the agency actually failed to adequately evaluate the environmental impacts of its decisions to grant the APDs. Based on the record and arguments before us in this appeal, however, Plaintiffs have failed to persuade us the district court abused its discretion in concluding that they have not shown a substantial likelihood of success under the deferential standard of review applicable to judicial review of agency actions.

**III.**

We accordingly **AFFIRM** the district court's denial of Plaintiffs' request for a preliminary injunction.

15-2130, <u>Dineʹ Citizens Against Ruining Our Environment v. Jewell</u>
**LUCERO**, J., concurring in part and dissenting in part.

My colleagues in the majority conclude that our longstanding circuit precedent allowing courts to consider the four preliminary injunction factors in a holistic fashion has been impliedly overruled by <u>Winter v. Natural Resources Defense Council</u>, 555 U.S. 7 (2008). (Majority Op. 9-11.) I disagree that the Supreme Court has sub silentio reversed a decades-old standard used by a majority of circuits. Accordingly, I respectfully dissent in part.

**I**

For more than fifty years, we have held that a plaintiff may obtain a preliminary injunction without showing its

> right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.

<u>Cont'l Oil Co. v. Frontier Ref. Co.</u>, 338 F.2d 780, 781-82 (10th Cir. 1964) (per curiam). In its more recent formulation, we have stated a movant who demonstrates that the remaining three preliminary injunction factors "tip strongly in his favor . . . may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." <u>Davis v. Mineta</u>, 302 F.3d 1104, 1111 (10th Cir. 2002) (quotation omitted). A majority of our sibling circuits have adopted a similar test. <u>See</u> <u>Citigroup Global Mkts., Inc. v. VCG Special Opportunities</u>

Master Fund Ltd., 598 F.3d 30, 36 n.5 (2d Cir. 2010) (collecting cases). Courts refer to this standard as the "serious questions" test, which is one version of the "sliding scale" approach to preliminary injunctions. See Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).

This common sense approach reflects the need to provide district courts with flexibility to maintain the status quo when confronted with difficult cases that will surely result in irreparable harm. Ruling on a motion for a preliminary injunction "is often a delicate and difficult balancing act, with complex factual scenarios teed up on an expedited basis, and supported only by limited discovery," making it "seem almost inimical to good judging to hazard a prediction about which side is likely to succeed." Alliance for the Wild Rockies, 632 F.3d at 1139-40 (Mosman, J., concurring); see also Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981) (because preliminary injunctions are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits," we do not require a moving party to "prove his case in full"). Our court has cautioned that such rulings are often "based on an abbreviated record and made without the benefit of full briefing and oral argument," rendering them "tentative in nature and not binding at a subsequent trial on the merits." Homans v. City of Albuquerque, 366 F.3d 900, 904-05 (10th Cir. 2004).

Requiring a movant threatened with imminent, irreparable injury to prove a probability of success on this expedited basis ignores the practical realities of litigation. "The very purpose of an injunction . . . is to give temporary relief based on a preliminary estimate of the strength of plaintiff's suit . . . . Limiting the preliminary injunction to

2

cases that do not present significant difficulties would deprive the remedy of much of its utility." Citigroup, 598 F.3d at 35-36 (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2948.3 (2d ed. 2009)). In exercising equitable discretion over motions for temporary relief, courts cannot woodenly employ a one size fits all mindset. "Equity eschews mechanical rules; it depends on flexibility." Holmberg v. Armbrecht, 327 U.S. 392, 396 (1946); see also Vaughan v. John C. Winston Co., 83 F.2d 370, 373 (10th Cir. 1936) ("Equity is efficient because its remedies are flexible, and may be adapted to the needs of the occasion.").

With these principles in mind, it seems to me the majority reads too much into Winter. In doing so, they take the minority position among circuits to have considered the issue. See Alliance for the Wild Rockies, 632 F.3d at 1134-35 (holding that a "serious questions" version of the sliding scale approach to preliminary injunctions survives Winter); Citigroup, 598 F.3d at 35-38 (2d Cir. 2010) (same); Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725 (7th Cir. 2009) (same); see also Revel AC, Inc. v. IDEA Boardwalk LLC, 802 F.3d 558, 569-71 (3d Cir. 2015) (applying sliding scale test for a stay pending appeal post-Winter). But see Pashby v. Delia, 709 F.3d 307, 320-21 (4th Cir. 2013) (concluding Winter impliedly overruled any sliding scale approach).

I agree with the majority view among the circuits. It would be surprising if the Supreme Court, without comment, "eliminated the longstanding discretion of a district judge to preserve the status quo with provisional relief until the merits could be sorted out in cases where clear irreparable injury would otherwise result and at least serious

3

questions going to the merits are raised." Alliance for the Wild Rockies, 632 F.3d at 1134 (quotation and italics omitted). Had the Court intended "to abrogate the more flexible standard for a preliminary injunction, one would expect some reference to the considerable history of the flexible standards applied in this circuit, seven of our sister circuits, and in the Supreme Court itself." Citigroup, 598 F.3d at 38; see also id. at 38 n.8 (explaining that the standards for a stay and a preliminary injunction are similar, and the Supreme Court stated in Hollingsworth v. Perry, 558 U.S. 183, 190 (2010) (per curiam), which was post-Winter, that a stay pending disposition of a petition for writ of certiorari requires only a "reasonable probability" that certiorari will be granted).

Yet nothing in the text of the Winter majority opinion indicates that a sliding scale approach is impermissible. See Winter, 555 U.S. at 51 (Ginsburg, J., dissenting) (noting that "courts have evaluated claims for equitable relief on a 'sliding scale'" and that the "Court has never rejected that formulation, and I do not believe it does so today"). The Court recited the ordinary preliminary injunction standard, stating that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20. It also stated that the Ninth Circuit test at issue was inconsistent with the requirement that a movant make a "clear showing" of its right to relief. Id. at 22. But neither of these statements is novel; both have coexisted with our serious questions, sliding scale test for many years. See, e.g., Doran v. Salem Inn, Inc., 422 U.S. 922, 931 (1975) (describing the ordinary preliminary injunction standard); SCFC ILC, Inc. v.

4

VISA USA, Inc., 936 F.2d 1096, 1098 (10th Cir. 1991) (noting the "clear showing" requirement). For example, in Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234 (10th Cir. 2001), we noted both the ordinary preliminary injunction test and the clear showing standard, and nevertheless applied the serious questions test. Id. at 1246, 1253. It cannot be the case that these statements in Winter overruled our traditional approach.

As I read Winter, the Court took exception to the Ninth Circuit's rule that a movant could obtain a preliminary injunction by showing a "possibility" of irreparable harm. 555 U.S. at 21. It expressly stated that this "standard is too lenient." Id. at 22. Such a rule runs counter to the "basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." Younger v. Harris, 401 U.S. 37, 43-44 (1971); see also Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.").

But our circuit precedent does not permit a party to obtain equitable relief by showing a mere "possibility" of success on the merits. Instead, a movant must demonstrate "that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." Davis, 302 F.3d at 1111. This is far from the toothless "possibility" threshold rejected in Winter. The serious questions standard has been interpreted to require "at least a reasonable probability of success on the merits." Winnemucca Indian

5

Colony v. U.S. ex rel. Dep't of the Interior, 837 F. Supp. 2d 1184, 1190 (D. Nev. 2011). This is the same degree of probability utilized by the Supreme Court post-Winter in ruling on stay motions. Hollingsworth, 558 U.S. at 190. Further still, "[b]ecause the moving party must not only show that there are serious questions going to the merits, but must additionally establish that the balance of hardships tips decidedly in its favor, its overall burden is no lighter than the one it bears under the likelihood of success standard." Citigroup, 598 F.3d at 35 (quotation, citation, and emphasis omitted).

In a different context, when tasked with deciding whether a traditional approach to equitable relief had been overruled, the Supreme Court explained that

> [t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied.

Hecht Co. v. Bowles, 321 U.S. 321, 329-30 (1944). The same is true in this instance. I dissent from the majority's conclusion that Winter overruled our traditional approach to preliminary injunctions.

## II

Despite my disagreement with the majority's mode of analysis, I concur in its ultimate resolution of the case. I would hold that plaintiffs have failed to demonstrate that they are sufficiently likely to prevail on the merits even under the serious questions standard, assuming that the remaining factors tip strongly in their favor. The majority

6

opinion cogently explains the shortcomings in plaintiffs' arguments, and I will not repeat its analysis here. However, I wish to make a few points explaining my view that plaintiffs fail even under a lesser standard.

Plaintiffs argue that the 2003 Environmental Impact Statement ("EIS") considers impacts of vertical wells in the northern portion of the San Juan Basin rather than horizontal drilling in the southern portion, and thus the BLM has not adequately considered the cumulative impacts of the challenged drilling. But this argument fundamentally mischaracterizes the 2003 EIS, which is concerned with <u>total</u> impacts across the basin—not sub-regional impacts.

Although the 2003 EIS assumes that most development will occur in the "high development area" of the basin, it specifically explains that it is intended to provide "a broad scale, 'big picture' level of analysis" because "the exact locations of projected oil and gas development and other changes are not known at this time." The EIS provides estimates for the total impacts of drilling across the entire New Mexico portion of the basin, including the number of new wells on federal land, miles of new road, long- and short-term surface disturbance, vegetation loss, impact on sensitive species, effect on cultural resources, and total net change in emission of volatile organic compounds, carbon dioxide, and particulate matter. And the cumulative impacts section again notes that it provides a "more general" analysis because "decisions about other actions in the planning area would be made by many public and private entities, and the location, timing, and magnitude of these actions are not well known."

7

In contrast, the Environmental Assessments ("EAs") focus on site-specific impacts. They provide estimates for greenhouse gasses, criteria air pollutants, and volatile organic compounds for each approved well, along with site-specific discussions of soil, groundwater, wildlife, cultural, and visual resources. The EAs also provide annual emissions totals by county. However, they refer to the 2003 EIS for a more detailed discussion of cumulative impacts with respect to the entire portion of the San Juan Basin in New Mexico.

Importantly, plaintiffs do not argue that the total impacts of drilling in the basin have exceeded the total impacts predicted in the 2003 EIS. Instead, they argue that tiering to the 2003 EIS is impermissible because horizontally drilled wells have greater impacts than vertically drilled wells on a well-by-well basis (specifically referencing air pollutant emissions, surface disruptions, volatile organic compounds, water use, and noise impacts). But the individual impacts of wells are considered in the EAs, not in the EIS. And plaintiffs have not shown that the analysis of total impacts contained in the EIS is invalid. It appears undisputed that the total number of wells drilled in the basin remains far below the number projected in 2003. And both short-term and long-term surface disturbances have been lower than predicted.

Plaintiffs also make much of the fact that the BLM has elected to amend the 2003 Resource Management Plan ("RMP") to "address the impacts of changing patterns of oil and gas development that have occurred since its publication." But National Environmental Policy Act ("NEPA") regulations make clear that an agency may continue to act pursuant to an RMP "[d]uring the preparation of a program or plan NEPA

8

document . . . when that action is within the scope of, and analyzed in, an existing NEPA document." 43 C.F.R. § 46.160. This would be a much different case if plaintiffs had shown—or even argued—that total impacts had surpassed those predicted. But because the total impacts of drilling in the New Mexico portion of the San Juan Basin remain within the scope of the 2003 EIS, suspension of activities under that plan is not required. See 40 C.F.R. § 1506.1(c) (requiring suspension of agency action if "the action is not covered by an existing program statement").

Essentially, plaintiffs argue that the BLM may not tier to the 2003 EIS—even though its estimates of total impacts have thus far proven overly conservative—because the site-specific impacts of horizontal wells differ from the site-specific impacts of vertically drilled wells. Yet they have not identified any defect in the site-specific analyses contained in the EAs. Although there may be some possibility that plaintiffs will prevail upon a full presentation of their case, I would hold that their argument falls short of establishing serious questions as to whether the BLM acted in an arbitrary and capricious manner.